IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

NATHAN CAGLE,

    Petitioner,                    No. CIV-S-04-0636 LKK KJM P

    vs.

THERESA SCHWARTZ,

    Respondent.               FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a state prisoner proceeding pro se with an application for writ of habeas corpus under 28 U.S.C. § 2254. Petitioner challenges several convictions he sustained in the Superior Court of Yolo County in 2002, on two separate grounds. Respondents filed an answer on December 8, 2004.

I. Background

        After plaintiff was convicted and sentenced in the Superior Court of Yolo County, Petitioner appealed to the California Court of Appeal. Answer, Ex. 1. In its decision affirming petitioner's convictions and sentence, the Court of Appeal summarized the trial court proceedings and the evidence presented at trial as follows:

> Defendant Nathan Cagle was convicted on various charges, including embezzlement, grand theft, extortion, and stalking, stemming from his association with two women with whom he had

1

a romantic relationship. . .

Carol Weinmann owned a stained glass and upholstery shop (Kat's Custom Upholstery) in Woodland, California. She had been in business approximately seven years when defendant entered her shop to look around while he was having his car repaired. They quickly began dating, and soon became intimate.

Defendant told Weinmann he was active in the Native American community. He referred to himself as Windwalker. He did Native American artwork, and made Weinmann a ceremonial Native American wedding dress. He told Weinmann they would grow old together.

Defendant eventually began to do his artwork in Weinmann's shop. Defendant offered to do things to help Weinmann around the shop. She taught defendant how to take bids for her. He did more and more things for her around the shop, and she did things for him as well. They helped each other out, but defendant was not Weinmann's employee.

Defendant was unemployed at the time, so Weinmann loaned defendant money to purchase a car and car stereo. Defendant only paid back $50 of the approximately $2,040 he owed her for the car and stereo.

In January 1998 defendant opened a car detailing business next to Weinmann's shop. Weinmann purchased the business license and the first stock of supplies for defendant. Defendant's shop and Weinmann's were connected by a metal roll top door that could be locked only from defendant's side. Weinmann's shop was protected by an alarm. Weinmann gave defendant the access code to the alarm.

After defendant opened his business he did not spend as much time at Weinmann's shop, although he continued to help her out. She also helped him by detailing cars with him.

Defendant started making significant business decisions for Weinmann's business, even though she did not give him permission to do so. Around March 1998, defendant took an order for an upholstering job from Willibaldo Rodriguez. Defendant quoted Rodriguez $537.94 for the job, but only charged Rodriguez $300. Weinmann and her employees did the upholstery work. Defendant gave Weinmann $200 and told her Rodriguez would pay the rest later. Rodriguez paid the remaining $100, but Weinmann never received it.

In another incident Weinmann prepared an estimate for work to be done on a boat by James Canady. Defendant gave the bid to Canady, but Weinmann did the work. The bid was for $2,970.93.

1      Canady paid $500 up front and tendered a gift certificate for $200.

2      Weinmann only received $2,170.93 of the remaining $2,270.93, even though Canady paid the full amount.

3

4      In another incident Polly Nelson came to Weinmann to repair the broken stained glass on her front door. Nelson contracted separately with defendant to remove and re-install the door. Weinmann quoted Nelson $1,435 to do the glass work, with the understanding she would be paid by Nelson's insurance company. Weinmann never received the money from the insurance company. The insurance company sent the checks for Weinmann's work to defendant and defendant cashed them. The checks were made out to "Nathan Deon, Doing Business as Kat's Custom Upholstery," and "Nathan Deon, Doing Business as Kat's Stained Glass[.]" Defendant told the claims adjuster the drafts should be made out to him because he owned the business.

10     On March 13, 1998, Weinmann discovered defendant had received an e-mail from a woman named Caroline, indicating defendant had spent the previous evening with Caroline. Weinmann confronted defendant and "told him to pack up his beads and feathers and leave." Weinmann had the locks and the alarm code changed in her shop.

13

14     Weinmann felt she needed to get away so she went to Clear Lake for the weekend. When she returned to her shop on Monday, she found defendant in her shop. He bragged to her that he had convinced the police and the alarm company he was supposed to be there. Defendant told Weinmann if she wanted him out of her life, "then I am going to sue you. I'm going to ruin you in this town. I'm going to see my attorney. . . . Oh, by the way, how much fire insurance do you have on this place?" He then demanded she put him on her payroll and paid [sic] him $400 per week until June 10, 1998.

19     After this incident Weinmann started to notice money was missing from the shop. To test defendant, she put a check in her desk drawer, and when she came in the next morning the check was gone. She stopped payment on the check. A few days later, on June 10, defendant told her he could not work for her anymore.

22     On June 12, 1998, defendant sent Weinmann a letter demanding $10,400. Weinmann turned the letter over to the police. Defendant called Weinmann twice demanding the money.

24     Defendant began following Weinmann around town. He gave her "evil" looks and glared at her. She felt threatened by him and did not believe her encounters with him occurred by chance. She also began receiving hang-up phone calls. Finally, in September she got a restraining order against defendant.

3

> Weinmann's property started disappearing during the time defendant was in her life, and she stopped noticing property was missing after he was gone. She made a list of items he took. The total value of the missing items was $11,455.88.
>
> Brenda Klein met defendant in June 1998. They soon began dating and became intimate. On July 31, 1998, defendant called Klein and told her he was being arrested for violation of probation. Klein loaned defendant $3,200 to hire an attorney. She also allowed him to stay with her to avoid going to jail. She accepted third party custody of him, and he lived with her for a period of about nine weeks.
>
> Klein had her own business selling credit card equipment and debit machines. Klein hired defendant as an independent contractor in her business because he needed a job for probation. Defendant charged Klein for some business cards without her permission. Klein also agreed to co-sign a contract for defendant to get a cellular phone. She later found out the phone bill was in her name. Klein paid approximately $2,000 for defendant's phone charges.
>
> Klein noticed things like tools, jewelry, and coins turned up missing while defendant was staying with her. Klein estimated the missing items had a value of around $1,159.
>
> The jury convicted defendant of embezzlement based on the money defendant took from Weinmann on the Rodriguez, Canady, and Nelson jobs. He was convicted of check fraud based on possession of one of the checks from Nelson's insurance company. He was convicted of two counts of grand theft based on the personal property taken from Weinmann and Klein. He was found guilty of diversion of construction funds based on the Nelson job. The jury found him guilty of one count of extortion based on his demand to be on Weinmann's payroll, and guilty of stalking against Weinmann. He was found guilty of two counts of grand theft by false pretenses, one against Weinmann and one against Klein.
>
> The jury found defendant not guilty of extortion of the $10,400 from Weinmann. The jury was unable to reach a verdict on one count of check fraud and the burglary charge.
>
> The trial court sentenced defendant to a total of nine years in prison.

Answer, Ex. 4 at 1-6.

Petitioner filed a petition for review challenging the Court of Appeal's order affirming petitioner's convictions and sentences. Answer, Ex. 5. The petition was denied. <u>Id</u>.,

4

Ex. 6. Only the Court of Appeal issued a reasoned opinion with respect to any of the claims brought before this court. Id., Ex. 4.

II. Habeas Corpus Standard

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Also, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA"). See Ramirez v. Castro, 365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did not address the merits of petitioner's Eighth Amendment claim).[1] Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d). Lockyer, 538 U.S. at 71 (overruling Van Tran v. Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district

---

[1] In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . . At best, it is constitutional dicta." However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees. Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation of the Constitution before he or she may obtain habeas relief. See Lockyer, 538 U.S. at 70-71; Ramirez, 365 F.3d at 773-75.

courts to review state court decisions for error before determining whether relief is precluded by § 2254(d)). It is the habeas petitioner's burden to show that he is not precluded from obtaining relief by § 2254(d). See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different. As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002). A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law if the state court simply fails to cite or fails to indicate an awareness of federal law. Early v. Packer, 537 U.S. 3, 8 (2002).

This court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S. 919 (2003). Where the state court fails to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must perform an "independent review of the record to ascertain whether the state court decision was objectively unreasonable. Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). In other words, the court assumes the state-court applied the correct law, and analyzes whether the decision of the state court was based on an objectively unreasonable application of that law.

1    It is appropriate to look to lower federal court decisions to determine what law has
2 been "clearly established" by the Supreme Court and the reasonableness of a particular
3 application of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).
4 III.  Arguments And Analysis
5          A. Peremptory Challenges
6    Petitioner's first claim is that the prosecution violated plaintiff's constitutional
7 rights by exercising peremptory challenges on two jurors because of their race.  Pet. at 24-27.
8 Purposeful discrimination on the basis of race in the exercise of peremptory challenges violates
9 the Equal Protection Clause of the United States Constitution.  Batson v. Kentucky, 476 U.S. 79,
10 89 (1986); Johnson v. California, 545 U.S. 162 (2005).  So-called Batson claims are evaluated
11 using a three-step test:

> First, the movant must make a prima facie showing that the
> prosecution has engaged in the discriminatory use of a peremptory
> challenge by demonstrating that the circumstances raise "an
> inference that the prosecutor used [the challenge] to exclude
> veniremen from the petit jury on account of their race." [Citation
> omitted.]  Second, if the trial court determines a prima facie case
> has been established, the burden shifts to the prosecution to
> articulate a [gender]-neutral explanation for challenging the juror
> in question. [Citation omitted.]  Third, if the prosecution provides
> such an explanation, the trial court must then rule whether the
> movant has carried his or her burden of proving the existence of
> purposeful discrimination.

19 Tolbert v. Gomez, 190 F.3d 985, 987-88 (9th Cir. 1999).  The burden of persuasion regarding
20 discriminatory motivation "rests with, and never shifts from, the opponent of the strike.'"  Yee v.
21 Duncan, 463 F.3d 893, 897 (9th Cir. 2006) (quoting Purkett v. Elem, 514 U.S. 765, 768 (1995)).
22    The California Court of Appeal addressed petitioner's Batson claims as follows:

> Two of the potential jurors claimed Native American Heritage.
> Another was Hispanic.  One Native American, Lopez, was
> dismissed after the prosecutor's challenge for cause.  The other
> Native American, Vigil, and the Hispanic, Macias, were dismissed
> after peremptory challenges.

26

7

Macias was excused before the jury was sworn, but Vigil was excused after the jury had been sworn and before the alternate jurors were sworn. After the peremptory challenge to Vigil, defendant asked to reserve a motion pursuant to *People v. Wheeler*, *supra*.

Defendant's *Wheeler* motion,[2] did not dispute the for cause challenge of Lopez, noting Lopez stated he felt he would be biased in favor of a Native American. The motion disputed the peremptory challenges of Vigil and Macias.

a. *Prospective Juror Vigil*

The trial court found defendant had made a prima facie case of discrimination as to Vigil, and asked the prosecutor for a justification of his challenge to Vigil.

The prosecutor stated he was concerned about Vigil because she said at first she might be partial. When the court asked her if she would be thinking about things similar to Lopez's concern, she responded that she would. In the prosecutor's mind, Lopez was a clear cut motion to excuse for cause. Vigil said she would not hold the District Attorney to a higher standard than the defense, but the prosecutor said he thought she seemed uncomfortable answering the question.

In ruling on the motion the trial court stated Vigil had expressed her feelings in such a way "that raised in my mind a question of her ability to allow the People to start from a neutral point, that is, taking into account the presumption of innocence, but letting the People start from that point that the law allows them to. And her responses to those questions at first, they way she stated it, really came across like she was having some doubts about that." The trial court expressed it would have exercised a peremptory to excuse Vigil, had it been prosecuting the case, even if Vigil had not been Native American.

We review a trial court's ruling on a *Wheeler* motion with considerable deference because such motions call upon a trial court's personal observations. (*People v. Howard* (1992) 1 Cal.4th 1132, 1155.) We affirm a denial of a *Wheeler* motion if the record contains grounds that would have made a peremptory challenge of a juror in question reasonable. (*Ibid*.)

/////

---

[2] Petitioner's counsel challenged the peremptory strikes pursuant to People v. Wheeler, 22 Cal.3d 258 (1978), which prohibits, under the California Constitution, the use of racially motivated peremptory challenges. Id. at 276-77. A Wheeler motion serves as an implicit objection under Batson. People v. Yeoman, 31 Cal.4th 93, 117 (2003).

8

In the present case, the trial court made a "sincere and reasoned attempt" to evaluate the prosecutor's reasons for challenging Vigil, and the record contains reasonable grounds for the challenge. (*People v. Silva* (2001) 25 Cal.4th 345, 386.) The trial court did not err in denying the *Wheeler* motion as to Vigil.

b. *Prospective Juror Macias*

Defendant asserts in his opening brief, without citation to the record, that the trial court found the *Wheeler* motion untimely as to Lopez, and that the trial court erred by failing to find a prima facie case as to Lopez. The record does not bear out either of these assertions. Defendant asserts in his reply brief that these are arguments he meant to make with respect to prospective juror Macias, not Lopez. We accept defendant's claim he mistakenly used Lopez's name when making these arguments, since the arguments are applicable to Macias and have no factual foundation as to Lopez.

A *Wheeler* motion is timely if it is made before jury empanelment is completed. (*People v. McDermott* (2002) 28 Cal.4th 946, 969; *People v. Gore* (1993) 18 Cal.App.4th 692, 703.) Where the trial is to be heard with alternate jurors, jury empanelment is not complete until the alternates are selected and sworn. (*People v. McDermott, supra*, at p. 969; *In re Mendes* (1979) 23 Cal.3d 847, 853; *People v. Rodriguez* (1996) 50 Cal.App.4th 1013, 1023.) The trial court thus erred when it ruled the *Wheeler* motion was untimely as to prospective juror Macias. (*People v. Rodriguez, supra*, at p. 1023.)

We nevertheless find the error harmless because defendant failed to make a prima facie showing of discrimination. There exists a presumption "that a party exercising a peremptory challenge is doing so on a constitutionally permissible ground." (*People v. Wheeler, supra,* 22 Cal.3d at p. 278.) The presumption may be rebutted by a prima facie showing of discrimination. (*Id*. at p. 280.)

To make a prima facie showing, a defendant must make a complete record, establish that the excluded persons are members of a cognizable group, and show from the circumstances of the case that the person is being challenged because of his or her group association. (*People v. Wheeler, supra*, 22 Cal.3d at p. 280.) A sufficient prima facie showing is made where the defendant shows, "that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic – their membership in the group – and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate

>by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all.  Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts, may also be called to the court's attention." (*People v. Wheeler, supra*, at pp. 280-281, fn. omitted.)
>
>Here, defendant's sole showing with respect to Macias was that Macias was "not Native American [but] was a minority whose answers . . . did not seem to raise a[n] identifiable problem with the People, other than being young and Hispanic.  I don't recall him saying anything that would cause one concern."
>
>Additionally, unlike *People v. Gore, supra*, there was no "prima facie pattern of systemic exclusion[.]" (*People v. Gore, supra*, 18 Cal.App.4th at p. 705.)  In *Gore*, the prosecutor peremptorily excused the only four prospective Hispanic jurors before the panel of 12 jurors was sworn.  (*Id*. at p. 697.)  When the alternate jurors were called for selection, the prosecutor immediately used the first peremptory challenges to excuse the only three Hispanic prospective alternate jurors.  (*Ibid*.)  Only then did it become apparent that the prosecutor systemically had excluded every Hispanic juror.
>
>In the present case, the exclusion of one other person of an identifiable group does not show a pattern of systematic exclusion. The defense counsel stated during the hearing on the motion that he believed the jury was "primarily, if not entirely, Caucasian." However, there was no evidence the prosecutor systematically challenged all persons of color.
>
>The exclusion of one Hispanic, in addition to one Native American, without more, is insufficient to show a prima facie pattern of discrimination, and is not enough to overcome the presumption that the prosecutor exercised his peremptory challenges in a constitutional manner.  (*People v. Turner* (1994) 8 Cal.4th 137, 165, 168 citing to *People v. Rousseau* (1982) 129 Cal.App.3d 526, 536-537 "[defense counsel's statement that 'there were only two [B]lacks on the whole panel, and they were both challenged by the district attorney" fails to establish a prima facie case.]".)

Answer, Ex. 4 at 6-11.

As noted above, it is petitioner's burden to establish that he is not precluded from obtaining habeas relief by 28 U.S.C. § 2254(d).  Petitioner has not met this burden because he

10

1  has not shown that the last state court opinion addressing his claim was flawed in the manner

2  required under § 2254(d). In fact, petitioner fails to make any argument concerning the Court of

3  Appeal's opinion regarding petitioner's <u>Batson</u> claim. <u>See</u> Pet. at 26-27.

4  In any case, the record before this court does not suggest that the Court of

5  Appeal's decision was flawed to the extent that this court could grant relief. The state appellate

6  court applied the standard found in <u>Batson</u> to petitioner's claim of discrimination in the selection

7  of jurors and the court did not apply the standard in a manner that is inconsistent in any respect

8  with any Supreme Court precedent. Also, there is nothing in the record before this court

9  indicating that the Court of Appeal's decision that petitioner did not state a prima facie case of

10  discrimination as to the use of a peremptory challenge against Macias, and that there were

11  reasonable grounds to challenge Vigil, was based upon an unreasonable determination of the

12  facts. Findings of fact made by state courts are presumed correct and petitioner has the burden of

13  rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Petitioner

14  here has not rebutted the presumption of correctness.

15  For all the foregoing reasons, petitioner's claim that the prosecution exercised

16  peremptory challenges against two jurors in violation of the Constitution must be rejected.

17  B.  <u>Prior Convictions</u>

18  Petitioner's second claim concerns evidence presented at trial indicating petitioner

19  had several prior convictions; he claims the evidence was "irrelevant" and cumulatively

20  prejudicial. Pet. at 28-35. The California Court of Appeal addressed this claim as follows:

> Defendant did not testify at trial. However, he offered evidence of several of his out of court statements that, if believed by the jury, supported his theory of defense, i.e., that the complaining witnesses were merely scorned women seeking to retaliate by their complaints to police.
>
> With the testimony of Kathleen Morrow defendant sought to cast doubt on Weinmann's testimony that their relationship was primarily personal and intimate, and that defendant was not her business partner and did not work for her as an employee. Morrow testified defendant told her Weinmann wanted to have a sexual

relationship with him, and defendant discussed with Morrow whether Weinmann was sexually harassing him. Defendant told Morrow he quit his job with Weinmann because Weinmann was sexually harassing him and because she had called him in for a business meeting and was waiting in the office naked.

Defendant also called James Willis to testify defendant told him he owned the upholstery shop. Defendant called Richard Durrenberg to testify defendant told him Weinmann wanted to have an affair with defendant, but that Weinmann was a "skag" and he was not attracted to her.

Defendant sought to cast doubt on Klein's testimony by depicting her as a drunk, angry woman who was out to get him. Durrenberg testified defendant told him he was frustrated with his situation with Klein, and that Klein was always drunk. He wanted out of the relationship because Klein was drunk all the time. Kathy Morrow testified defendant asked her to accompany him to Klein's house because he was concerned about Klein's temper and wanted a witness in case Klein attacked him or lied about him.[Fn1]

---

[Fn1] Defendant asserts these hearsay statements were admitted for the purpose of showing his state of mind and emotional attitude. As we expressed at oral argument, defendant's state of mind as it related to his conduct was not an issue. In any event, the statements were admitted for all purposes, the prosecution was entitled to impeach their credibility.

The prosecutor made a motion to impeach defendant's hearsay statements pursuant to *People v. Jaccobs* (2000) 78 Cal.App.4th 1444, hereinafter *Jacobs*. The trial court granted the motion and read a stipulation to the jury that defendant had been convicted of five felonies: "1975, transportation of a controlled substance; 1986, theft; 1990 theft; 1996, forgery; 1996, sale of migratory bird parts." The trial court further instructed the information was not to be used as evidence of defendant's propensity to commit crimes, but for the purpose of attempting to impeach defendant's credibility regarding his own statements.

---

The prosecutor made a motion to impeach defendant's hearsay statements pursuant to *People v. Jaccobs* (2000) 78 Cal.App.4th 1444, hereinafter *Jacobs*. The trial court granted the motion and read a stipulation to the jury that defendant had been convicted of five felonies: "1975, transportation of a controlled substance; 1986, theft; 1990 theft; 1996, forgery; 1996, sale of migratory bird parts." The trial court further instructed the information was not to be used as evidence of defendant's propensity to commit crimes, but for the purpose of attempting to impeach defendant's credibility regarding his own statements.

12

In *Jacobs,* a prosecution for receiving stolen property, the defendant sought to introduce his own statement to the investigating officer that he had purchased the property in question from an acquaintance. (78 Cal.App.4th at p. 1447.) The defendant did not testify at trial. (*Id*. at p. 1446.) The trial court allowed the prosecution to impeach the defendant's hearsay statement with evidence of the defendant's prior convictions. (*Id*. at p. 1449.)

The court of appeal agreed, holding Evidence Code sections 788 and 1202, taken together, provide that evidence of a prior felony conviction is admissible to impeach a criminal defendant's hearsay declaration.[Fn2] (*Id*. at pp. 1449-1450.)

---

[Fn2] Evidence Code section 788 provides that with certain exceptions not relevant here, the credibility of a witness may be attacked by showing the witness has been convicted of a felony.

Evidence Code section 1202 provides: "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or deny such inconsistent statement or other conduct. Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing. For the purposes of this section, the deponent of a deposition taken in the action in which it is offered shall be deemed to be a hearsay declarant."

---

The purpose of allowing a hearsay declarant to be impeached by an inconsistent statement, other conduct, or "[a]ny other evidence[,]" is to be fair to the party against whom the hearsay was received, since that party is denied the opportunity to impeach the statement by cross-examination. (*Am-Cal Investment Co. v. Sharlyn Estates, Inc.* (1967) 255 Cal.App.2d 526, 542; Evid Code, § 1202.)

Defendant argues his credibility was not placed in issue, and that the prior convictions were only related to defendant's character and to show defendant had a history of committing such crimes. Defendant attempts to distinguish *Jacobs*, because there the hearsay declaration had the effect of exonerating Jacobs, whereas here his hearsay declaration was merely an expression of his "emotional attitude" toward Weinmann. Defendant claims his hearsay statements that he was not in love with Weinmann went only to his state of mind.

The record does not support defendant's claim his statements were admitted only for the purpose of showing state of mind. In fact, the

13

statements were admitted for all purposes without objection from the prosecution. The hearsay declarations were offered by defendant at least in part to tell defendant's version of the events, and to thereby disprove the charges against him. As such, the prosecution was entitled to impeach the hearsay statements with evidence of defendant's prior felony convictions.

Defendant also argues the prior convictions should have been inadmissible under evidence code section 352 because of the multiplicity of convictions and because of the remoteness of the first three convictions.

Under Evidence Code section 352, the trial court has discretion to exclude evidence ". . . if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or misleading the jury."

"'When an objection to evidence is raised under Evidence Code section 352, the trial court is required to weigh the evidence's probative value against the dangers of prejudice, confusion and undue time consumption. Unless these dangers "substantially outweigh" probative value, the objection must be overruled. [Citation.] On appeal, the ruling is reviewed for abuse of discretion. [Citation.]'" (*People v. Hart* (1999) 20 Cal.4th 546, 606, quoting *People v. Cudjo* (1993) 6 Cal.4th 585, 609.) We will not disturb the trial court's exercise of discretion "unless the court acted in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" (*People v. Yovanov* (1999) 69 Cal.App.4th 392, 406.)

The trial court should consider four factors when making a determination under Evidence Code 352: "'(1) whether the prior conviction reflects adversely on an individual's honesty or veracity; (2) the nearness or remoteness in time of a prior conviction; (3) whether the prior conviction is for the same or substantially similar conduct to the charged offense; and (4) what the effect will be if defendant does not testify out of fear of being prejudiced because of impeachment by prior convictions. [Citation.]'" (*People v. Green* (1995) 34 Cal.App.4th 165, 182, quoting *People v. Muldrow* (1988) 202 Cal.App.3d 636, 644.)

Alluding to the above factors, defendant argues the 1976 drug conviction and the 1986 and 1990 theft convictions were too remote in time. However, even remote convictions may be admissible under Evidence Code section 352 where the defendant has not led a subsequently blameless life. (*People v. Green*, *supra*, at p. 183.) A systematic occurrence of convictions creates a pattern that is relevant to a defendant's credibility. (*Ibid*.) Here, defendant was convicted of forgery six years after the nearest prior conviction and only two years before the crimes at issue occurred. Taken

|   |   |
|---|---|
| 1 | together, the convictions show a systematic occurrence of convictions indicating the trial court did not err in determining the remote prior convictions were more probative than prejudicial. |
| 2 |  |
| 3 | Citing *People v. Lewis* (1987) 191 Cal.App.3d 1288, 1297, Defendant argues the multiplicity of convictions weighed against the introduction of those convictions.  However, *People v. Lewis*, *supra*, held it was not error to permit impeachment with more than one felony conviction because a "series of crimes evidencing moral turpitude is more probative of a defendant's willingness to give perjured testimony than a single such offense."  (*Ibid.*) |
| 4 |  |
| 5 |  |
| 6 |  |
| 7 | The People concede the prior conviction for sale of migratory bird parts was not a crime of moral turpitude.  Nevertheless we find the admission of this evidence harmless.  Evidence defendant had gone to federal prison possessing eagle feathers was already before the jury without objection from defendant. |
| 8 |  |
| 9 |  |

Answer, Ex. 4 at 11-17.

In his petition, petitioner argues that the decisions of the trial court and the Court of Appeal concerning the admission of evidence indicating petitioner had sustained prior convictions violate several provisions of California law.  Pet. at 28-29, 32-34.  However, as noted above, habeas corpus relief is only available for violations of federal law.  28 U.S.C. § 2254(a).

Petitioner also asserts some violations of federal law.  First, petitioner claims, as he did before the Court of Appeal and the California Supreme Court that the Due Process Clause of the Fourteenth Amendment forbids the use of prior convictions that do not involve moral turpitude for impeachment purposes.  Pet. at 28:19-24; cf. Answer, Ex. 1 at 27 & Ex. 5 at 1.  However petitioner fails to cite any case law in support of this argument and it does not appear that the United States Supreme Court has ever issued such a broad holding.  Therefore, the court is barred from granting petitioner relief in this claim under 28 U.S.C. § 2254(d).

Next, petitioner cryptically asserts, as he did before the California Supreme Court that "[c]onviction of a criminal offense based on irrelevant evidence is a violation of federal due process. (*In re Winship* (1970) 397 U.S. 358.)" Pet. at 29:1-2; cf. Answer, Ex. 5 at 12.  But Winship is not a case concerning how prior convictions may be used against a criminal

15

defendant, nor is it a case in which the Supreme Court addresses in any respect what kind of evidence is admissible at a criminal proceeding and what kind is not. Rather, Winship held that juveniles, when charged with a crime, are entitled to the benefit of the reasonable doubt standard. 397 U.S. at 368. There is nothing in Winship indicating petitioner's rights arising under federal law were violated by the admission into evidence at petitioner's trial of prior convictions. Again, petitioner is precluded from obtaining relief under 28 U.S.C. § 2254(d).

Finally, petitioner claims, as he did before the California Supreme Court:

> To not permit the introduction of [petitioner's] state-of-mind evidence, at the cost of opening the floodgates of prior conviction evidence, denied [petitioner] the fundamental rights to due process, compulsory process, and confrontation. (*Washington* v. *Texas* (1967) 388 U.S. 14, 22; *Martin v. Ohio* (1987) 480 U.S. 228, 233; *Crane v. Kentucky* (1986) 476 U.S. 683, 690.)

Pet. at 33:1-5; cf. Answer, Ex. 5 at 16.

In addressing the gist of this claim, the Court of Appeal appropriately found that the hearsay evidence presented by petitioner was not relevant simply with regard to petitioner's "state of mind," but was admitted for all purposes; for example, it also indicated that Weinmann and Klein had motive to lie, or did in fact lie to police about petitioner committing criminal acts. Answer, Ex. 4 at 15. It does not appear petitioner's "state of mind" regarding the nature of his relationships with Weinmann and Klein was relevant in this case in any respect because his thoughts about Weinmann and Klein, considered in isolation, have no bearing on whether petitioner was guilty of the crimes charged. In other words, petitioner's thinking that Weinmann and Klein harbored ill feelings against petitioner does not excuse or explain in any way petitioner's committing the crimes charged.

The question remains whether the prosecution's use of prior convictions as a means to impeach the hearsay testimony identified in the Court of Appeal's opinion violated petitioner's Constitutional right to due process as that right has been defined by the United States Supreme Court.

The Supreme Court has held that a defendant's prior convictions may be used for impeachment purposes if he or she testifies so long as jurors are instructed, as they were in this case, that such evidence may not be considered for the purpose of determining guilt. See, e.g., Gray v. Maryland, 523 U.S. 185, 200 (1998); cf. CT 550-551; RT 1907. But the Supreme Court has never addressed when a defendant's out of court statements can be impeached with the use of prior convictions, nor does Supreme Court precedent regarding the use of prior convictions make it clear that a defendant's out of court statements cannot be impeached by prior convictions. For this reason as well, petitioner is precluded from obtaining habeas relief under 28 U.S.C. § 2254(d).

IV. Conclusion

For all of the foregoing reasons, the court will recommend that petitioner's application for writ of habeas corpus be denied.

In accordance with the above, IT IS HEREBY RECOMMENDED that petitioner's application for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: September 4, 2007.

_____
U.S. MAGISTRATE JUDGE

1
cagl0636.157